**CEDAR POINT APARTMENTS, LTD.,**
Appellee and Cross-Appellant,

v.

**CEDAR POINT INVESTMENT CORPO-
RATION, William Bruce, and Donald
Ham, Appellants and Cross-Appellees.**

**WELLINGTON GREEN APARTMENTS,
LTD., Appellee and Cross-Appellant,**

v.

**B & D INVESTMENT CORPORATION,
William Bruce, and Donald Ham,
Appellants and Cross-Appellees.**

Nos. 84–1294, 84–1342.

United States Court of Appeals,
Eighth Circuit.

Submitted Nov. 15, 1984.

Decided March 4, 1985.

Rehearing and Rehearing En Banc
Denied April 9, 1985.

F. William McCalpin (argued), Daniel P. Card, II, Chester A. Love and Richard Ahrens, St. Louis, Mo., for appellants and cross-appellee.

Burton H. Shostak, St. Louis, Mo., for appellee and cross-appellant.

Before ARNOLD, Circuit Judge, HENLEY, Senior Circuit Judge, and JOHN R. GIBSON, Circuit Judge.

ARNOLD, Circuit Judge.

This is an action for breach of a contract to sell two apartment complexes in St. Louis County, Missouri, known as the Cedar Point Apartments and the Wellington Green Apartments. The action was brought by the buyers, Cedar Point Apartments, Ltd., and Wellington Green Apartments, Ltd., as assignees of the original parties to the contract. The sellers, defendants in the District Court, are Cedar Point Investment Corp., B & D Investment Corp., William Bruce, and Donald Ham. On a prior appeal, *Cedar Point Apts., Ltd. v. Cedar Point Inv. Corp.*, 693 F.2d 748 (8th Cir.1982), *reversing Ariko v. Cedar Point Inv. Corp.*, 527 F.Supp. 602 (E.D.Mo. 1981), we held that the sellers had broken the contract and remanded for further proceedings. On remand, the District Court[1] awarded to the buyers damages of $978,175 for breach of contract. It found, however, that sellers had not been guilty of malice, so as to justify an award of punitive damages for tortious interference with contract, and it also held that buyers were not entitled to prejudgment interest.

Defendants-sellers appeal, contesting the amount of damages awarded. We agree with their position in part and hold that one element used by the District Court in computing damages, a so-called "interest-rate differential," should not have been used. We therefore reduce the damage judgment to $271,110. As so modified, the judgment will be affirmed. Plaintiffs-buyers cross-appeal, claiming they should have received punitive damages and prejudgment interest. We also affirm on these issues. The District Court's findings of fact are not clearly erroneous, and the arguments against its application of the law of Missouri, its own State, are not sufficiently cogent to override the deference we customarily give the district courts on such questions.

## I.

Everyone agrees on the legal standard for measuring damages for breach of a contract to sell land. The damages are the difference between the fair market value of the land on the date fixed for the sale, and the price agreed to in the contract, the price for which the buyers could have had the land if the sellers had kept their promise to sell. It is also agreed that the price for which the land was actually sold in December 1979, six months after the contract in suit should have been carried out, is a fair proxy for the fair market value of the land in June 1979. It is not claimed that the lapse of six months' time was material for valuation purposes. In order to determine the damages, therefore, it is necessary only to ascertain the contract price agreed to by the parties and the price at which the sellers later actually sold the land to third persons, and subtract the former number from the latter. The computation must be made separately for the Cedar Point Apartments and the Wellington Green Apartments. For convenience we shall refer to the contract in suit as the Nicholson contract, using the name of one of the original buyers (whose interests were later assigned to the named plaintiffs), and we shall refer to the December 1979 contract, which actually led to a completed sale, as the Lipton contract, using the name of one of the persons who actually acquired the property from the defendants.

In order to frame the issue intelligibly, we shall describe at some length the District Court's findings and computations with respect to each of the two apartment complexes. There is no dispute about the validity of the Court's findings of historical fact. The issue is rather one of logic and method. In each case, the contract price is composed of several elements. Some of

1. The Hon. James H. Meredith, Senior United States District Judge for the Eastern District of Missouri. The Court's findings of fact and conclusions of law fixing the amount of damages, which we shall refer to as "Findings and Conclusions," are unreported. *John G. Ariko v. Ce-* *dar Point Inv. Corp.*, No. 79–1006–C(C) (E.D.Mo. Nov. 14, 1983). Its later opinions explaining its rationale and denying prejudgment interest are reported as *Ariko v. Cedar Point Inv. Corp.*, 580 F.Supp. 507 (E.D.Mo.1984).

the price is designated as cash, paid directly by the buyers to the sellers at closing. Some of it is designated as a "HUD mortgage," that is, a mortgage to be placed on the property by the buyers, the proceeds of which are to be paid over in cash to the sellers at closing. And some of the price is designated as "cash-surplus notes," promissory notes to be delivered by the buyers to the sellers at closing, payable over a certain period of time at a certain rate of interest, but apparently payable only if the property produces sufficient profit or cash surplus to cover the payments. The HUD mortgages, of course, are also payable over a certain period of time at a certain rate of interest, but the mortgages, called "HUD mortgages" because their payment is insured by the Department of Housing and Urban Development, are payable not to the sellers but to a lender, DRG Financial Corporation, a HUD-approved mortgagee.[2] The debt that the mortgages secure, in other words, is held by the lender, DRG, and the proceeds of the mortgages go entirely to the sellers at closing in cash. We are not dealing with a seller-financed transaction, in which the sellers themselves could expect to receive periodic payments of principal and interest over an agreed period of time.

With respect to the Nicholson contract to buy the Wellington Green Apartments, the District Court made the following findings as to contract price. The total purchase price was $3,275,000, composed of the following elements: (1) cash, $327,500; (2) a cash-surplus note in the principal amount of $178,000, with a term of 35 years and bearing interest at zero per cent. (0%); and a HUD- or FHA-insured note in the principal sum of $2,769,500, with interest at eight and one-half per cent. (8½%) per year for a term of 35 years, the note being secured by a first deed of trust on the property. The HUD- or FHA-insured note provided for 420 level monthly payments of principal and interest to the HUD-approved mortgagee, DRG.

When amounts to be paid to the sellers in the future are commuted to present value (and there is no dispute among the parties as to the method for doing this), the value of the Nicholson contract for Wellington Green, as found by the District Court, may be expressed as follows:

| | |
|---|---|
| HUD Mortgage | $2,769,500 |
| Cash Paid | 327,500 |
| Capital-Surplus Note | 7,429 |
| TOTAL PRESENT VALUE | $3,104,429 |

Using this same approach, the present value of the Lipton contract for purchase of Wellington Green can be expressed in tabular form as follows:

| | |
|---|---|
| HUD Mortgage | $2,890,000 |
| Cash Paid | 253,803 |
| Capital-Surplus Notes | 85,797 |
| TOTAL PRESENT VALUE | $3,229,600 |

The difference between these two figures representing present value, $3,229,600 for the Lipton contract on Wellington Green, and $3,104,429 for the Nicholson contract on Wellington Green, is $125,171, and the District Court found, Findings and Conclusions at 13–14, that this figure was the difference between the present values of the two contracts. To this figure, however, the District Court added an additional element, and it is here that the positions of the parties diverge. The HUD mortgage contemplated by the Lipton contract was payable over a period of 35 years in level monthly payments of principal and interest, just as was the mortgage contemplated by the Nicholson contract, but the interest rate in the Lipton mortgage was nine and one-half per cent. (9½%), as opposed to the eight and one-half per cent. (8½%) loan called for by the Nicholson contract. This difference in interest rates, of course, produces a corresponding difference in monthly payments under the two mortgages. Under the Nicholson contract for Wellington Green, the monthly payments would have been $21,837.51, while under the Lipton contract, the monthly payments are to

---

**2.** No one suggests that the mortgagee is related to or affiliated with the sellers. It is not argued, therefore, that the sellers benefit indirectly from any payments made over time to the mortgagee.

be $24,947.93. The difference is $3,110.42, an additional sum that the mortgagee under the Lipton contract will receive each month, over and above what the mortgagee under the Nicholson contract would have received. According to plaintiffs' expert witness, whose testimony on this point is undisputed, the present value of this $3,110.42 monthly difference over a period of 35 years is $378,575.47. (The discount rate used in computing this present value was nine and one-half per cent. (9½%), and again there is no dispute about this rate).

This fourth element, the so-called interest-rate differential, was then added to the first three elements already described, so that the total damages for breach of the Wellington Green contracts was computed by the District Court substantially as follows:

| | | |
|---|---|---|
| (1) | Difference in present value of the two contracts | $125,171 |
| (2) | Present value of difference in HUD-insured loan payments, otherwise known as "interest-rate differential" | $378,575 |
| | TOTAL | $503,746 |

Thus, the damage computation includes not only the difference between the full face amounts of the two HUD mortgages, but also the difference between monthly payments of principal and interest to be made under those mortgages to the lenders.

The same approach was employed to determine damages for the breach of the contract to sell the Cedar Point Apartments. Here, the District Court found, Findings and Conclusions at 14, that the difference in present value between the Lipton and Nicholson contracts for purchase of the Cedar Point Apartments was $145,938. To this figure it added an interest-rate differential computed in the same way as described above, in the amount of $328,491. It then awarded damages for breach of the contract to sell the Cedar Point Apartments in the total sum of $474,-429. Again, the District Court's method includes both the difference in the face amounts of the two HUD mortgages and the difference in monthly payments to be made under those mortgages to the lenders.

Defendants object to the inclusion of the interest-rate differential in these computations. They argue first of all that this figure must be, to some extent, a duplication of the increase in the face amount of the HUD mortgages. The monthly payments under the Lipton contracts are larger than the monthly payments under the Nicholson contracts not only because the interest rate is higher, but also because the principal amount to be borrowed is higher. Each monthly payment contains both principal and interest, in varying amounts as the loan is amortized over time, and a higher principal amount borrowed obviously increases the monthly payments. Defendants also argue, more fundamentally, that use of the interest-rate differential in the present context is inconsistent with the law of Missouri as expressed in *Dunning v. Alfred H. Mayer Co.*, 483 S.W.2d 423 (Mo. App.1972), which holds, they say, that a disappointed buyer suing for breach of contract cannot recover anything for an increase in interest costs unless he actually incurs or agrees to incur those costs. Here, of course, the plaintiff buyers did not actually have to agree to a nine and one-half per cent. (9½%) loan in order to buy either this or comparable property. The nine and one-half per cent. (9½%) loan was made by the Lipton group, who later actually bought the property, and comes into the picture here only because the Lipton contracts are being used as evidence of the fair market value of the property on the date that the Nicholson contracts should have been closed. To these arguments we now turn.

## II.

### A.

In the first place, we see no way around defendants' argument that some duplication in the award of damages has occurred here. To the extent that monthly payments under the Lipton contracts are higher than monthly payments under the Nich-

olson contracts because the principal amounts in the Lipton transaction are higher than those in the Nicholson transaction, the interest-rate differential obviously duplicates another element of the damages calculation. It is important to remember that the full face amount of the HUD mortgages has been taken into account before the question of the interest-rate differential even comes up. In the case of the Nicholson contract on Wellington Green, for example, the face amount of the HUD mortgage is $2,769,500, and the "present value" of this mortgage is included in the damage calculation at precisely this full amount. No discount has taken place to reflect the fact that the mortgage is to be paid over 35 years at a certain rate of interest, and this is completely proper, because, as we have noted above, the sellers are receiving cash at closing. They do not care where the cash comes from, so long as they receive it. The fact that the mortgage is to be paid off over a period of years at a given interest rate is of interest only to the lenders, not to the sellers, since they are not financing this portion of the transaction. (Compare the treatment of the cash-surplus notes, which are payable to the sellers, and which are therefore included in the damage computation not at their full face amount, but rather at a discounted value.)

### B.

The award of damages, then, must be reduced at least in the amount of the differences between the principal sums of the HUD mortgages. Such a reduction would take care of the duplication we have described. But defendants argue that the entire interest-rate differential should be eliminated from the calculation, and we agree, because this calculation is infirm for a more fundamental reason than simple duplication of another element of damages.

The essential point to keep in mind is that it is the fair market value of the land and improvements in question that is at issue. There is no dispute about the value of the Nicholson contract as such: the dispute is whether the value of the Lipton contract is to be enhanced by reason of the fact that the interest rate assumed by the buyers under that contract was higher than the interest rate that would have been assumed by the buyers under the Nicholson contract if it had gone through. As plaintiffs themselves put it in their brief to this Court, Brief for Appellees 17, "[t]he present value of the Lipton contract was that amount a willing purchaser was willing to pay to a willing seller for the property and so it is the value of the property." But formulating the issue in this way is fatal to plaintiffs' own position. The amount paid to the seller under the Lipton contract, taking the example of Wellington Green, was $3,229,600. Using this amount as the Lipton contract's present value yields a damage figure, as explained above, of only $125,171. The fact that the purchaser under the Lipton contract had to borrow money for nine and one-half per cent. (9½%) is of consequence to the sellers only to the extent that the interest rate necessarily affects the amount of money a buyer is willing to pay, because the lower the interest rate may be, the greater amount of money the buyer may be willing to borrow. The $3,229,600 in present value paid to the sellers by the Lipton buyers already reflects whatever economic influence the interest rate that those buyers had to pay possessed. In this sense, the increase in interest rates between the Nicholson and Lipton contracts is actually a factor tending to decrease the market value of the land, rather than increase it. "A rational person would pay more for the same property if it went with financing at a lower interest rate." Garland, *Purchaser's Interest Rate Increases: Caveat Venditor*, 27 N.Y.L.Sch.L.Rev. 745, 781 (1982) (footnote omitted).

There is some suggestion in plaintiffs' submissions that property subject to a nine and one-half per cent. (9½%) loan could have a greater market value than the same property with an eight and one-half per cent. (8½%) loan. HUD apparently controls the rents in projects it insures, and the rents may be fixed at a level sufficient to carry the expenses of owning and man-

aging the property, one of which expenses is interest. The difficulty with this approach is that the District Court made no findings sufficient to support it. It did say, Findings and Conclusions at 15, that property with a loan at a higher rate of interest *"perhaps* could have a greater market value" (emphasis ours), but this would depend not simply on whether higher rents could be charged, but on whether the increase in rents would be great enough to produce a greater *net* return. The Court went on to observe that in HUD-insured projects "the rents are controlled *to some extent*" (emphasis ours), *ibid.*, but again the finding is not sufficiently precise to enable anyone to say to what extent, if any, the value of any particular piece of property may have been increased. It is therefore impossible to gauge what effect, if any, this factor might have on market value, and to use the entire amount of the interest-rate differential as a measure of the effect of this factor is completely without support in the findings of the District Court.

Plaintiffs also resort to incantations intended to impress us with the special nature of HUD-insured financing. They use such phrases as "tax shelters," "highly leveraged transactions," and the like. The nature and terms of financing arrangements, they say, can be the most important element in transactions of this kind, and it was therefore necessary for the District Court to take into account the different financing terms available to the Nicholson and Lipton buyers. We have no quarrel with these propositions in the abstract. The difficulty is that the relevant comparison here is between the two contracts for the sale of the land and improvements, not between the two financing arrangements. Certainly a nine and one-half per cent. (9½ %) mortgage, from the point of view of the mortgagee-lender, is worth more than an eight and one-half per cent. (8½%) mortgage. That is not at all the same thing as saying that a seller who receives $3,000,000 for his land is better off when the buyer incurs a debt at a nine and one-half per cent. (9½%) rate than he would be if the buyer's debt had been at an eight and

one-half per cent. (8½%) rate, and that, essentially, is the proposition that plaintiffs have to sustain. We conclude that it was error to take into account the interest-rate differential in determining the damages in this case.

We can think of some ways in which the interest-rate differential might have become relevant. For one thing, it might be argued that the Nicholson buyers, plaintiffs here, once the contract with them had been broken, would have had to pay a higher rate of interest if they had decided to go out on the market and buy comparable property for investment. To that extent, therefore, the increase in interest rates damages them, and this increase should be taken into account in determining the amount of any judgment to which they are entitled. To this possibility there are several answers. In the first place, plaintiffs themselves emphasize that no such approach was used here. "[T]he trial court ... specifically and correctly avoided" this method of justifying its damage award. Brief for Appellees 21. In the second place, such an approach is ruled out by Missouri law. In *Dunning v. Alfred H. Mayer Co.*, 483 S.W.2d 423, 429 (Mo.App. 1972), the Court of Appeals of Missouri, St. Louis District, specifically held that a disappointed buyer cannot recover for an increase in interest rates that he has in fact neither paid nor committed himself to pay. Unless the buyers contracted for or committed themselves to a loan at the increased rate, they have not been damaged. Here, there is no claim that the plaintiffs actually incurred a higher rate of interest in purchasing comparable property.

It might also be argued that if the contract had been consummated, and plaintiffs had become the owner of the property subject to an eight and one-half per cent. (8½ %) loan, they would later have been able to use that lower-than-market interest rate to get a favorable deal for themselves on resale. If the market rate of interest is nine and one-half per cent. (9½%), and if the existing eight and one-half per cent. (8½%) loan is assumable, the property becomes to

some extent more attractive to buyers. Again, however, plaintiffs specifically disavow this theory as a justification for the District Court's judgment. Brief for Appellees 17–18. And again, such a theory would find no support in the District Court's findings here. The Court did find that the eight and one-half per cent. (8½%) mortgage, if it had come into being, would have been assumable under proper circumstances, but it did not find that HUD would have permitted the Lipton purchasers to assume this mortgage, nor that Lipton would have made a contract with plaintiffs, had plaintiffs closed under their own contract with defendants. See 580 F.Supp. at 511. In fact, the Court did not even find that the Lipton purchasers would have been eligible to assume the putative eight and one-half per cent. (8½%) mortgages. It found only that it was *"possible* that purchasers under the December 29, 1979, contracts *may have been* eligible to assume the HUD ... insured mortgages obtained by plaintiffs under the January 11, 1979, contracts if closing had occurred under the January 11, 1979, contracts." Findings and Conclusions at 12. Such a tentative finding falls far short of supporting the theory that plaintiffs would have realized a gain from their lower-than-market interest rate. It is unnecessary to pursue this line of analysis further, but we note, merely for the sake of completeness, that it is not at all clear that any such gain, if it had in fact come about, would have been equal to the full amount of the interest-rate differential. See Garland, *supra,* 27 N.Y.L.Sch.L.Rev. at 781–82.

Finally, it might be argued that the sellers could have financed the sales themselves, that if they had they would have received the mortgage payments each month, and that the interest-rate differential would surely then have been material to them. The short answer is that this is simply not what happened. The parties, for reasons best known to themselves, chose not to structure the transaction in this way. And if they had the purchase price, not being paid in cash at closing, might well have been quite different.

In sum, the proper measure of damages here is the difference between the Nicholson and Lipton contracts' present values, without taking into account the interest-rate differential. This means that the judgment must be reduced to $271,110. Defendants argue that the judgment should be further reduced to take into account the fact that defendants, before the Lipton sale took place, had to incur substantial expense for rehabilitation and construction work required by HUD. The District Court was not persuaded by this testimony, and we cannot say that its failure to accept it is clearly erroneous.

### III.

It remains to discuss the issues raised by plaintiffs' cross-appeal. They argue first that the District Court clearly erred in failing to find that defendants were guilty of tortious interference with the contract of sale. The only possible relevance of this contention would be that it would make plaintiffs eligible for an award of punitive damages, because compensatory damages are already being awarded on the contract theory. The District Court found, however, that defendants had not acted with malice. This finding is not clearly erroneous, and we therefore affirm the denial of punitive damages. It is not necessary to discuss further the various contentions of the parties relative to tortious interference with contract.

Finally, plaintiffs argue that prejudgment interest should have been awarded. This is a question of state law, on which we normally defer to the judgment of the district courts. The issue turns on whether the amount of damages awarded was ascertainable with reasonable certainty in accordance with a recognized legal standard. Certainly there is a recognized legal standard here. As noted above, all parties are in accord that the measure of damages is the difference between the contract price and the fair market value of the land. The specific amount produced by this standard, though, was hotly contested,

and no one could say with much assurance what that amount would be until the District Court ruled, or, indeed, until this Court has ruled on appeal. In *St. Joseph Light & Power Co. v. Zurich Ins. Co.*, 698 F.2d 1351, 1355–58 (8th Cir.1983), on which plaintiffs principally rely, the total amount of damages was undisputed. It was only the allocation of this amount as between two defendants that was in doubt. We agree with the District Court that the uncertainties as to the amount of damages in this case were substantially more pronounced. In our view, this case is closer to *Fohn v. Title Ins. Corp.*, 529 S.W.2d 1 (Mo.1975) (en banc), than it is to *St. Joseph*, and we adopt the District Court's discussion on this issue. See 580 F.Supp. at 511–12.[3]

## IV.

The judgment of the District Court is modified so as to award plaintiffs $271,110. In all other respects, it is

Affirmed.

---

3. The able District Judge sat as a member of this Court in *St. Joseph*. He knows as much about what that opinion means as we do.